23CA0804 Peo v Gonzalez-Fierro 07-23-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0804
Arapahoe County District Court No. 21CR2779
Honorable David Karpel, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jesus Roberto Gonzalez-Fierro,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE WELLING
Schock and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 23, 2026

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Chelsea E. Mowrer, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Jesus Roberto Gonzalez-Fierro, appeals his judgment of conviction for first degree murder.  We affirm.

## I.     Background

¶ 2     Gonzalez-Fierro strangled his wife to death in the women's restroom at the library where she worked as a cleaner.  Afterward, he left the library and went straight to a nearby police station to confess.  In the parking lot at the station, he found an off-duty officer, Officer Blayne Jemelka, leaving after his shift had ended.  Gonzalez-Fierro only speaks Spanish.  Officer Jemelka understood basic Spanish.  Believing Gonzalez-Fierro wanted to turn himself in, Officer Jemelka radioed for backup.  Two uniformed officers, Officers Wade Hackett and another officer, arrived.  After some back and forth between Officer Jemelka and Gonzalez-Fierro, Officer Jemelka believed that Gonzalez-Fierro had said that he had strangled his wife and that she was now dead.  The officers then called a LanguageLine[1] interpreter for assistance.  They then brought Gonzalez-Fierro into the station, where he was questioned,

---

[1] LanguageLine is a telephonic interpretation service that police officers use to speak to non-English-speaking people.

twice advised of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), and ultimately arrested.

¶ 3    Gonzalez-Fierro was charged with first degree murder.  Prior to trial, Gonzalez-Fierro filed a motion to suppress statements that he made to officers both outside and inside the police station. Following a hearing, the trial court denied the motion.  Gonzalez-Fierro's case proceeded to a jury trial.  His theory of defense at trial was that he didn't kill his wife after deliberation; instead, he argued that he had acted impulsively under a heat of passion, asserting that he had just discovered that she had cheated on him.  The jury found Gonzalez-Fierro guilty of first degree murder.  The trial court sentenced him to life in the custody of the Department of Corrections.

## II.    Issues on Appeal

¶ 4    Gonzalez-Fierro raises four issues on appeal.  The first three relate to the trial court's denial of his suppression motion.  The last issue relates to the trial court's description of the presumption of innocence to prospective jurors.  We address each, in turn, below.

## A. Gonzalez-Fierro's Statements

¶ 5    Gonzalez-Fierro raises three contentions related to his statements to police officers after he arrived at the police station. He contends that (1) he was subjected to a custodial interrogation before he was given his *Miranda* advisement; (2) his post-*Miranda* statements were the product of an impermissible two-step interrogation; and (3) he didn't knowingly and intelligently waive his *Miranda* rights.  We address, and reject, each contention in turn below.

### 1. Standard of Review

¶ 6    We review the denial of a suppression motion as a mixed question of law and fact.  *People v. Matheny*, 46 P.3d 453, 459 (Colo. 2002).  We defer to the trial court's factual findings if supported by competent evidence, and we review its legal conclusions de novo.  *Id.* at 462.

### 2. Custody

¶ 7    First, Gonzalez-Fierro contends that he was in custody when he made his pre-*Miranda* statements.  We disagree.

¶ 8    When Gonzalez-Fierro arrived at the police station in the early morning hours, it was still dark and was snowing.  Officer Jemelka attempted to communicate with Gonzalez-Fierro in Spanish and learned from Gonzalez-Fierro that he had killed his wife.  While the officers were attempting to get an interpreter on the phone, Officer Hackett asked Gonzalez-Fierro if he could pat Gonzalez-Fierro down.  Gonzalez-Fierro consented, and Officer Hackett patted him down.  The officers also took Gonzalez-Fierro's identification and didn't return it.

¶ 9    After a few minutes outside, Officer Jemelka asked Gonzalez-Fierro if he would go inside to an interview room with the other officers.  Officer Hackett then guided Gonzalez-Fierro through the police station, telling him where to turn.  They arrived at a small, windowless interview room.  Officer Hackett sat between Gonzalez-Fierro and the door.  The door remained open the entire time of the pre-*Miranda* questioning.  Officer Hackett asked Gonzalez-Fierro a few questions through the interpreter on the phone — where he admitted to killing his wife — before reading him his *Miranda* rights.  The pre-*Miranda* interaction, including the time outside the police

station, lasted around fifteen minutes. The entire interrogation, including the post-*Miranda* questioning, lasted over three hours. Gonzalez-Fierro was alone with officers the entire time and wasn't accompanied by a representative. At times during the interview, he was emotional and visibly upset.

¶ 10    After conducting a hearing on Gonzalez-Fierro's motion to suppress, the trial court found that Gonzalez-Fierro wasn't in custody when he made his pre-*Miranda* statements. Specifically, the court found

- that Gonzalez-Fierro had approached Officer Jemelka in the police station parking lot;

- that the initial conversation in the parking lot was a "consensual contact with the police by" Gonzalez-Fierro and that the contact was initiated by Gonzalez-Fierro;

- that it was snowing and cold outside;

- that the officers took Gonzalez-Fierro inside the station to a long and narrow interview room, the door remained open the entire time Gonzalez-Fierro was in there, and he wasn't handcuffed;

- that Officer Hackett never threatened Gonzalez-Fierro, there were no acts of coercion, and Officer Hackett maintained a conversational tone during the questioning; and

- that the entire questioning lasted over three hours, "not all of that [was] in active communication with the defendant," but "the bulk of it certainly [was] questioning the defendant."

¶ 11     At trial, the People introduced Gonzalez-Fierro's pre-*Miranda* statements by playing Officer Hackett's body-worn camera footage of the encounter.  These statements included that he had come to the police station to confess that he had killed his wife at the library that morning.

### b.     Applicable Law

¶ 12     "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'"  *Matheny*, 46 P.3d at 463 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  Rather, the "ultimate inquiry" for determining whether a *Miranda* warning is required is whether a person is both in custody

6

and subject to a police interrogation. *Id.* (quoting *Beheler*, 463 U.S. at 1125).

¶ 13     "A person is in custody for *Miranda* purposes if [he] has been formally arrested or if, under the totality of the circumstances, a reasonable person in the suspect's position would have felt that [his] freedom of action had been curtailed to a degree associated with formal arrest." *People v. Garcia*, 2017 CO 106, ¶ 20.  A "custody assessment 'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned,'" *Mumford v. People*, 2012 CO 2, ¶ 15 (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)), and it's irrelevant to a custody determination whether the individual is "actually arrested at the close of the interview," *Matheny*, 46 P.3d at 468 n.10.

¶ 14     Nonexclusive factors courts consider in determining whether an interrogation was custodial include

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of

restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Id.* at 465-66 (quoting *People v. Trujillo*, 938 P.2d 117, 124 (Colo. 1997)).

### c. Analysis

¶ 15    Gonzalez-Fierro contends that he was in custody when he made his pre-*Miranda* statements to police and, therefore, those statements must be suppressed because they were the product of an un-Mirandized custodial interrogation. We disagree and conclude that Gonzalez-Fierro wasn't in custody when he made his pre-*Miranda* statements.

¶ 16    As an initial matter, we reject the People's argument that Gonzalez-Fierro didn't need *Miranda* warnings at all because he made the challenged statements after coming to the police station on his own initiative to volunteer his confession. The People contend that all the officers who came into contact with Gonzalez-Fierro at the police station did was "merely . . . facilitate defendant's volunteered confession," so, the People continue, *Miranda* doesn't

8

apply.  Perhaps the People would be correct if all the officers at the police station did was merely acquiesce to Gonzalez-Fierro's desire to spontaneously confess.  *See People v. Gonzales*, 987 P.2d 239, 242-43 (Colo. 1999).  After all, "[t]he Fifth Amendment protects defendants from improper forms of police interrogation, not from their own impulses to speak."  *Id.* at 243.  But the officers here did more than merely acquiesce to Gonzalez-Fierro's impulse to speak to them.  Accordingly, we reject the People's contention that Gonzalez-Fierro wasn't interrogated.  *See People v. Wood*, 135 P.3d 744, 750 (Colo. 2006) ("Interrogation includes 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301(1980))).  Thus, we must address whether Gonzalez-Fierro was in custody to determine whether *Miranda* is implicated.  And that Gonzalez-Fierro voluntarily came to the police station to confess is merely a factor weighing in favor of him not being in custody.  It, however, isn't determinative of the issue.  *See, e.g., Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (explaining that the fact that the defendant

voluntarily came to the police station was important to, but not determinative of, the conclusion that he wasn't in custody).

¶ 17    We begin our custody analysis by noting that many of the *Matheny* factors weigh in favor of a finding of custody. First, Gonzalez-Fierro arrived at the police station early in the morning, while it was still dark, and it was snowing, *see People v. Cline*, 2019 CO 33, ¶ 22 (noting that an encounter that occurs during daylight weighs against custody and an encounter that takes place at night weighs in favor of custody), and upon his arrival an armed police officer patted him down. Second, Gonzalez-Fierro was alone with the officers during the interrogation. *See People v. Willoughby*, 2023 CO 10, ¶ 26 ("The fact that a defendant does not have a 'representative or neutral party present' during an interrogation weighs in favor of custody." (quoting *People v. Padilla*, 2021 CO 18, ¶ 23)). Third, the officers took Gonzalez-Fierro's identification and didn't return it, and he wasn't told that he was free to leave. Fourth, Officer Hackett guided Gonzalez-Fierro through the hallways of the police station to the interview room, which was small and had no windows, and Officer Hackett sat between Gonzalez-Fierro and the door during the interview. *See id.* at ¶ 38

("When officers give the suspect directions, that weighs in favor of custody."). Fifth, Gonzalez-Fierro was emotional and upset. *See Effland v. People*, 240 P.3d 868, 875 (Colo. 2010) (citing the defendant's emotional distress throughout the interrogation as a factor in favor of custody). And finally, and perhaps most importantly, the questioning occurred at a police station. *See Cline*, ¶ 21 (stating that a "police-dominated" location weighs in favor of custody).

¶ 18    While these factors point in favor of finding that Gonzalez-Fierro was in custody, the totality of the circumstances still weighs in favor of a conclusion that Gonzalez-Fierro wasn't in custody for two reasons. *See People v. Eugene*, 2024 CO 59, ¶ 19; *see also Willoughby*, ¶ 21 (providing that no single factor is determinative in a custody analysis). First, many of the factors that weigh in favor of custody discussed above are accompanied by mitigating circumstances that cut against custody. For example,

- although Gonzalez-Fierro was questioned in a small, windowless room, the door remained open during the entire pre-*Miranda* portion of the interview, *see People v. Lulei*, 2026 CO 17, ¶ 52;

11

- although Gonzalez-Fierro was emotional, there is no evidence in the record that any of the officers took advantage of his emotional state, *see People v. Theander*, 2013 CO 15, ¶ 43;

- although the officers were armed, "they neither drew their weapons nor made any show of force toward [Gonzalez-Fierro]," *Willoughby*, ¶ 34;

- although Gonzalez-Fierro followed Officer Hackett's directions to the interview room, these directions weren't accompanied by "force, threats of negative consequences for not complying, or an aggressive tone," *People v. Bohler*, 2024 CO 18, ¶ 33;

- although the interrogation occurred at the police station, Gonzalez-Fierro went to the station on his own initiative, *see Lulei*, ¶ 51; and

- although the police station is a secure facility, "officers entered and exited the interview room freely, and there is nothing in the record to suggest that, had [Gonzalez-Fierro] wanted to leave, [he] would not have been able to do so," *Matheny*, 46 P.3d at 467.

¶ 19    Second, several additional circumstances cut against a finding of custody. Gonzalez-Fierro wasn't handcuffed or restrained in any way. *See Willoughby,* ¶ 36 ("When an officer imposes a limitation on a suspect's movement during the interrogation, that weighs in favor of custody."). Officer Hackett maintained a calm and cordial demeanor and conversational tone throughout the encounter. *See id.* at ¶ 32 ("When the interrogation is in a 'conversational tone,' it is less likely to be custodial."). Officers also never told Gonzalez-Fierro that he was under arrest. *See id.* at ¶ 28 ("Courts place great weight on whether police tell a suspect that they are under arrest."). Last, the pre-*Miranda* portion of the interview wasn't lengthy, lasting just the first fifteen minutes of the three-hour interview. *See People v. Begay,* 2014 CO 41, ¶ 27 (encounter lasting less than twenty minutes weighed against custody).

¶ 20    Considering the totality of the circumstances, we conclude that Gonzalez-Fierro's freedom of movement wasn't restricted to a degree associated with a formal arrest. Accordingly, the trial court didn't err by concluding that Gonzalez-Fierro wasn't in custody when he made his pre-*Miranda* statements.

### 3. Two-Step Interrogation

¶ 21 Gonzalez-Fierro next contends that his post-*Miranda* statements were the product of an impermissible two-step interrogation. "A 'two-step interrogation' takes place when officers elicit incriminating statements from an *in-custody* suspect without giving him his *Miranda* rights and then interview him again later and obtain a confession after giving him his *Miranda* rights and securing a waiver of those rights." *Phillips v. People*, 2019 CO 72, ¶ 41 (emphasis added).

¶ 22 But because, as explained above, Gonzalez-Fierro wasn't in custody before he was read his *Miranda* rights, he couldn't have been subjected to a prohibited two-step interrogation. *See Lulei*, ¶¶ 35-36. Accordingly, Gonzalez-Fierro's post-*Miranda* statements weren't the product of a deliberate two-step interrogation.

### 4. Waiver of *Miranda* Rights

¶ 23 Gonzalez-Fierro next contends that even if officers didn't use an improper two-step interrogation procedure, his post-*Miranda* statements were inadmissible because he didn't knowingly and intelligently waive his *Miranda* rights. Again, we disagree.

## a.    Additional Facts

¶ 24    Gonzalez-Fierro speaks only Spanish.  After being led by Officer Hackett to the interview room, Gonzalez-Fierro was questioned for over three hours about his wife's death.  During that time, he was read his *Miranda* rights twice in Spanish — first, by the LanguageLine interpreter who translated the rights from Officer Hackett's English to Spanish, and second, by Spanish-speaking Deputy David Rodriguez.

¶ 25    About fifteen minutes into the interview, Officer Hackett told Gonzalez-Fierro, "[B]efore I ask you more questions I just want to uhm, go through your *Miranda* advisement and rights."  Officer Hackett then read the contents of an English-language written *Miranda* advisement, which the LanguageLine interpreter translated

into Spanish.  The LanguageLine interpreter translated Officer

Hackett's reading of the Miranda advisement as follows[2]:

- "[S]o you must understand that your rights.  Uhm.  You have the right to remain in silence.  Do you understand this?"[3]

- "Anything you say can be used against you in court."[4]

- "You have the uhm . . . the right to talk to a . . . uhm, representative, lawyer . . . uhm and . . . before they ask you more questions.  And to have him present during questioning."[5]

---

[2] The defense retained a Spanish-language expert who prepared a verbatim transcript of the interview and faithfully translated statements made in Spanish during the interview into English. According to the expert, some of the statements the officer said in English were imprecisely translated into Spanish by the LanguageLine interpreter.  The quoted language set forth below comes from what the expert opines that the LanguageLine interpreter told Gonzalez-Fierro the officer said.  The ellipses in this bulleted list are in the transcript prepared by the expert and denote the interpreter's pauses (not omitted words).

[3] Officer Hackett's statement in English: "Uhm, you must understand your rights, so . . . .  You have the right to remain silent.  Do you understand?"

[4] Officer Hackett's statement in English: "[A]nything you say can be used against you in court."

[5] Officer Hackett's statement in English: "You have the right to talk to a lawyer before you're questioned and have them present with you during any questions."

- "And if you want an attorney but can't pay for the attorney, one would . . . uhm, would be assigned to you by the court."[6]

- "And you can have someone represent you and that . . . man [sic] and that he/she be, that he/she be present, that he/she be present during your . . . your questioning or interrogation."

- "And if you decide to answer questions you still have the right. To have an attorney and have him . . . And you also have the right to stop at any moment . . . . Stop answering questions."[7]

- "[N]ow that you have been given the advice [sic] about your rights, they have explained to you . . . [d]o you want to talk to us about what happened with your wife last night?"[8]

---

[6] Officer Hackett's statement in English: "If you want the [sic] lawyer but cannot afford to hire a lawyer, a lawyer will be appointed by a court to represent you before you are questioned and to be with you during any questioning."

[7] Officer Hackett's statement in English: "If you decide to start answering questions[,] you will still have the right to stop answering questions and also the right to talk to a lawyer at any time."

[8] Officer Hackett's statement in English: "Being advised of your rights[,] are you willing to talk to us about what happened with your wife tonight?"

¶ 26 Gonzalez-Fierro answered "yes" or "ok" to each question or statement and then signed an English-language advisement form. Later in the interview, Spanish-speaking Deputy Rodriguez arrived. At that time, an investigator asked Gonzalez-Fierro if he wanted Deputy Rodriguez to repeat the *Miranda* advisement; after initially responding, "Whatever you want," Gonzalez-Fierro said yes.

¶ 27 Deputy Rodriguez then read to Gonzalez-Fierro the entirety of the written advisement that he had previously signed, translating its contents from English to Spanish. Deputy Rodriguez told Gonzalez-Fierro the written advisement said the following[9]:

- "You have the right to *belong* silent."

- "Anything you say can be used against you in court."

- "You have the right to have an attorney present with you while they ask you questions and when they . . . to answer questions as well."

---

[9] The quoted language set forth below comes from what the expert opined that Deputy Rodriguez told Gonzalez-Fierro the form said. Again, the ellipses in this bulleted list are in the transcript prepared by the expert and denote Deputy Rodriguez's pauses (not omitted words).

- "If you cannot hire a lawyer, a court would designate a lawyer for you . . . [s]o that he/she can be with you uhm while they ask you questions."

- "If you decide to start to . . . to answer questions, you have the right to stop answering at any moment[]."

- "[A]nd you have the right to talk to an attorney . . . [a]t anytime."

¶ 28 Again, Gonzalez-Fierro responded to each question or statement with "yes" or "ok." He also confirmed his signature on the advisement form and that it was an acknowledgment that "I have read this paper with my rights . . . and I understand my rights."

¶ 29 During the interview, Gonzalez-Fierro made multiple incriminating statements about killing his wife. Before trial, in Gonzalez-Fierro's motion to suppress his statements, he argued that both advisements were flawed translations that resulted in an invalid waiver of his rights. At the hearing on the motion to suppress, the court admitted the transcript of the entire interview that the defense's expert in Spanish-language interpretation had

prepared. After the hearing, the trial court found that both advisements were valid, ruling as follows:

> There is no talismanic language required for a valid *Miranda* advisement, and here the [c]ourt finds that each of the *Miranda* advisements that were given were valid. They substantially informed the defendant of his rights, although the [c]ourt acknowledges that on at least one occasion there is a question about the interpretation of before and whether that is before or while or during questioning. There is a dispute about the right to remain silent versus the right to belong silent. The [c]ourt notes that's in the final *Miranda* advisement after the prior advisement, noted and beginning on page 12 of defendant's Exhibit A [the transcription], which the [c]ourt finds is a close to perfect *Miranda* advisement. He explains and the interpreter translates, according to the defendant's own expert, a valid, proper *Miranda* advisement and the defendant waived his rights.

¶ 30    The People then introduced the audio and video recording of the interview, including Gonzalez-Fierro's post-*Miranda* statements, at trial.

b.    Standard of Review and Applicable Law

¶ 31    A *Miranda* advisement protects the privilege against self-incrimination. *Miranda,* 384 U.S. at 444. Officers must, therefore, inform a defendant that

20

> he has a right to remain silent; that if he waives his right to that silence anything he says may be used against him in a court of law; that he has the right to have an attorney present; and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so wishes.

*People v. Nguyen*, 2017 CO 92, ¶ 7.

¶ 32 A valid waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *Miranda*, 384 U.S. at 444. When evaluating whether a defendant knowingly and intelligently waived his rights when those rights were translated into his primary language for him, we must determine whether the translation "reasonably convey[ed]" his rights to him. *Nguyen*, ¶ 8 (quoting *People v. Mejia-Mendoza*, 965 P.2d 777, 781 (Colo. 1998)). Looking at the totality of the circumstances, we review this legal question de novo. *Id.*

¶ 33 "[A]lthough the *Miranda* warnings are an absolute prerequisite, they need not be conveyed through any particular 'talismanic incantation.'" *Id.* at ¶ 16 (quoting *Sanchez v. People*, 2014 CO 56, ¶ 12). Instead, we must look at the totality of the circumstances to see if Gonzalez-Fierro was advised of the following "three precepts: (1) he did not have to talk, (2) he could have an attorney present, and (3) if he did talk, his statements could be

21

used against him." *People v. Al-Yousif*, 49 P.3d 1165, 1172 (Colo. 2002). In doing so, we recognize that "no translation is perfect." *Mejia-Mendoza*, 965 P.2d at 782.

c.     Analysis

¶ 34     Gonzalez-Fierro contends that he didn't knowingly and intelligently waive his *Miranda* rights. Specifically, he contends that both the LanguageLine interpreter and Deputy Rodriguez failed to accurately convey to Gonzalez-Fierro his *Miranda* rights.

¶ 35     Upon review of the defense's transcript of the entire interview, we conclude that both the LanguageLine interpreter and Deputy Rodriguez "reasonably convey[ed]" the three required precepts — namely, that Gonzalez-Fierro didn't have to talk, that he had the right to have an attorney present, and his statements could be used against him at court. *Nguyen*, ¶ 8 (quoting *Mejia-Mendoza*, 965 P.2d at 781). We, however, still address each of Gonzalez-Fierro's specific contentions regarding each translation.

¶ 36     Gonzalez-Fierro contends that the LanguageLine interpreter failed to tell him that he could talk to a lawyer and that one would be appointed to him *before* questioning and at *any time*. But the interpreter told Gonzalez-Fierro that he had the right to talk to a

22

lawyer "before they ask you more questions." While it's true that the interpreter didn't tell him explicitly that a lawyer would be appointed before questioning, they did tell him that the lawyer would "be present during your . . . your questioning or interrogation." The interpreter also said, "[I]f you decide to answer questions you still have the right . . . to stop at any moment" and to "[s]top answering questions." These statements reasonably conveyed that Gonzalez-Fierro could talk to an attorney before the officers asked him more questions and that he could have a lawyer present at any point, including before questioning began and during such questioning. *See Carter v. People*, 2017 CO 59M, ¶ 14 ("[I]t would be highly counterintuitive for a reasonable suspect in a custodial setting, who has just been informed that the police cannot talk to him until after they advise him of his rights to remain silent and to have an attorney, to understand that an interrogation may then proceed without permitting him to exercise either of those rights.").

¶ 37     Gonzalez-Fierro also complains that the interpreter used the word "advice" instead of "advised" in asking him if he wanted to still talk to the officers. But, again, "no translation is perfect," *Mejia-*

*Mendoza*, 965 P.2d at 782, and the difference between "advice" and "advised" doesn't take away the fact that Gonzalez-Fierro was told the required information for him to knowingly and intelligently waive his rights.

¶ 38   Next, Gonzalez-Fierro finds numerous problems with Deputy Rodriguez's translation of the written *Miranda* waiver.[10]  He contends that Deputy Rodriguez didn't reasonably convey his right to remain silent because he interpreted the right to "remain" silent as the right to "belong" silent."  But this statement still reasonably conveyed to Gonzalez-Fierro that he didn't have to talk to the officers, especially when Deputy Rodriguez followed it up with "[a]nything you say can be used against you in court."  *Cf. Mejia-Mendoza*, 965 P.2d at 781 (concluding that the interpreter's statement that "[n]othing is being used against you" and "[j]ust because you say something you'll be released" didn't reasonably convey to the defendant that he had the right to remain silent).

¶ 39   Gonzalez-Fierro also contends that Deputy Rodriguez's interpretation of the written waiver didn't convey that he had the

---

[10] By this time, Gonzalez-Fierro had already been properly advised of his *Miranda* rights by the LanguageLine interpreter.

right to talk to a lawyer before questioning and that one would be appointed before questioning continued. But Deputy Rodriguez's interpretation of the written waiver told Gonzalez-Fierro that he had the right to talk to a lawyer at any time, that a lawyer would be appointed for him if he couldn't afford one, and that he had the right to have a lawyer present during questioning. Taken together, this reasonably conveyed that he could talk to an appointed lawyer before questioning. *See Carter*, ¶ 15 (explaining that *Miranda* warnings can't be evaluated in isolation and instead must be viewed in their "totality" (quoting *Florida v. Powell*, 559 U.S. 50, 61 (2010))).

¶ 40 Next, Gonzalez-Fierro notes that Deputy Rodriguez referred to the "advisement of rights" he read to Gonzalez-Fierro as a "form" instead of an "advisement" and that "[i]nstead of interpreting, 'I agree to answer questions,' [Deputy] Rodriguez said, 'I want to continue answering questions.'" But neither translation affected Deputy Rodriguez's previous proper translation of Gonzalez-Fierro's *Miranda* rights. Plus, we see no harm in translating both phrases the way that Deputy Rodriguez did.

¶ 41 Finally, Gonzalez-Fierro contends that neither the LanguageLine interpreter nor Deputy Rodriguez asked Gonzalez-

25

Fierro if he understood each right after being told it. But Gonzalez-Fierro doesn't cite any case law or statute that says a suspect must be asked if he understood his rights after *each* right was told to him. In any event, Gonzalez-Fierro said "yes" or "ok" after each right was read to him.

¶ 42    In sum, both advisements translated to Gonzalez-Fierro by the LanguageLine interpreter and Deputy Rodriguez reasonably conveyed to Gonzalez-Fierro his *Miranda* rights. Accordingly, the trial court didn't err by finding that Gonzalez-Fierro knowingly and intelligently waived his *Miranda* rights on both occasions. *See Mejia-Mendoza*, 965 P.2d at 782.

## B.    Presumption of Innocence

¶ 43    Last, Gonzalez-Fierro contends that the trial court erred by telling the prospective jurors during voir dire that it wouldn't instruct them to presume Gonzalez-Fierro is "100 percent innocent." We discern no error.

### 1.    Additional Facts

¶ 44    On the first day of trial, the trial court and parties conducted voir dire of the jury venire. During its introductory remarks to the potential jurors, the trial court instructed them that "[e]very person

charged with a crime is presumed to be innocent. This presumption of innocence remains with a defendant throughout the trial and must be given effect by you unless, after considering all of the evidence, you are convinced that the defendant is guilty beyond a reasonable doubt." And again, at the end of its introductory remarks, the trial court reminded the prospective jurors that

> one way to think about the presumption of innocence that I mentioned and the burden of proof is to remind you that that presumption of innocence remains with a person throughout the trial unless and until the district attorney proves beyond a reasonable doubt that the person is guilty. So if you were to take a vote right now as to whether Mr. Gonzalez-Fierro is guilty or not guilty, your decision — your vote must be not guilty because he's presumed innocent, you've heard no evidence, and therefore that burden of proof has not been met.

¶ 45 The prosecutor then conducted her voir dire. She also reminded the prospective jurors about the presumption of innocence and asked whether, at that point, Gonzalez-Fierro was guilty or not guilty. Most jurors agreed that he was not guilty. The prosecutor then repeated that the presumption of innocence is "the law that the judge is going to give you that says he is innocent until I do my job."

27

¶ 46    Next, defense counsel conducted her voir dire.  To begin, she

asked whether anyone on the venire couldn't "believe as [Gonzalez-

Fierro] sits here today that he is 100 percent innocent."  After one

prospective juror struggled with the concept of the presumption of

innocence, defense counsel asked if they were "told a rule that you

had to presume Mr. Gonzalez-Fierro 100 percent innocent as he sits

here today and through the entirety of trial, that sounds like

something that would not be something you can do."  After the

prosecutive juror still struggled to understand the concept, defense

counsel clarified that, "if you were told the rule that you had to

presume him innocent 100 percent right now and throughout trial,

it doesn't sound like that's something that you're going to be able to

do."  Before the prospective juror answered, the trial court

interrupted and told the prospective jurors the following:

> [Defense counsel], I'm sorry, I have to interrupt
> because the [c]ourt will not instruct anyone
> that they have to presume him 100 percent
> innocent; there's no instruction in the law that
> would permit me to do that.
>
> I want to emphasize, however, absolutely Mr.
> Gonzalez-Fierro is presumed innocent, and
> that presumption of innocence remains with
> him throughout the trial unless and until the
> jury determines that each and every element of

28

> the crime has been proven beyond a reasonable doubt. So I want to make sure everyone understands that.
>
> I simply — I cannot tell you that there is an instruction that puts any mathematical number on any of this; there isn't.

¶ 47    Defense counsel didn't object to this language and proceeded with questioning the prospective juror. A few days later, after the parties selected a jury and finished presenting evidence, the trial court instructed the jury again on the presumption of innocence before it began its deliberations.

### 2.    Standard of Review and Applicable Law

¶ 48    We review the question of whether a trial court accurately instructed the jury on the law de novo. *Tibbels v. People*, 2022 CO 1, ¶ 22. "Instructions that lower the prosecution's burden of proof below the reasonable doubt standard constitute structural error and require automatic reversal." *Id.* "Intrinsically related to [the reasonable doubt standard] is the presumption of innocence . . . ." *Id.* at ¶ 24. In considering whether a trial court's statements unconstitutionally lowered the prosecution's burden of proof, we must "ask whether there is a reasonable likelihood that the jury understood the court's statements, in the context of the

instructions as a whole and the trial record, to allow a conviction based on a standard lower than beyond a reasonable doubt." *Id.* at ¶ 43.

### 3. Analysis

¶ 49 We conclude that the trial court's statement to the jury venire that it wouldn't instruct them that Gonzalez-Fierro must be presumed "100 percent innocent" didn't unconstitutionally lower the prosecution's burden of proof. Given the context in which the trial court made this statement, there isn't a reasonable likelihood the jury understood it to allow a conviction based on a lower standard of proof. *See id.*

¶ 50 The trial court, prosecutor, and defense counsel all explained to the prospective jurors about the presumption of innocence. Both the trial court and prosecutor explained that the presumption required that, if jurors took a vote before trial began, they must find Gonzalez-Fierro not guilty. Furthermore, the trial court's statement was in response to defense counsel's statement to prospective jurors that they would hear a rule that Gonzalez-Fierro was "100 percent innocent" at that point of the trial. Because the trial court wasn't going to instruct the jury that Gonzalez-Fierro was "100

30

percent innocent," the court interrupted to clarify to the jury the correct instruction regarding the presumption of innocence.

¶ 51 We reject Gonzalez-Fierro's contention that the trial court "essentially told the jury that the law didn't require them to presume Gonzalez-Fierro innocent." Instead, the trial court merely clarified how it was going to instruct the jury regarding the presumption of innocence. So it didn't say that Gonzalez-Fierro wasn't 100 percent innocent at that point in the trial; it only said the true statement that it wouldn't instruct the jury that he was 100 percent innocent. After this statement, the court read the proper jury instruction on the presumption of innocence, explaining that "absolutely Mr. Gonzalez-Fierro is presumed innocent."

¶ 52 We agree with Gonzalez-Fierro that, if the court misled the jurors that they must presume Gonzalez-Fierro anything less than absolutely innocent, that would have been error. But, again, the court didn't directly or indirectly say this incorrect statement of law. So we discern no error by the trial court.

### III. Disposition

¶ 53 The judgment is affirmed.

JUDGE SCHOCK and JUDGE LUM concur.

31